Approved: <u>s/Sarah Lai, by the Court, with permission</u>
    SARAH LAI
    Assistant United States Attorney

Before: THE HONORABLE DEBRA FREEMAN
    United States Magistrate Judge  **20 MAG 8996**
    Southern District of New York

- - - - - - - - - - - - - - - - - X
               :  **<u>SEALED COMPLAINT</u>**
UNITED STATES OF AMERICA
               :  Violations of 18
    - v. -         U.S.C. §§ 2, 1343,
               :  1349
EVA CHRISTINE RODRIGUEZ,
  a/k/a "Christina Rodriguez,"  :  COUNTY OF OFFENSE:
  a/k/a "Elizabeth Christina     NEW YORK
  Powers,"         :
  a/k/a "Elizabeth Christina Davis,"
  a/k/a "Christina Elizabeth Davis," :
  a/k/a "Christina Anderson,"
  and           :
SERGIO LORENZO RODRIGUEZ,
  a/k/a "Sergio Lawrence,"    :
  a/k/a "Michael Lara,"
               :
       Defendants.
               :
- - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

    BRANDY N. KING-GONZALEZ, being duly sworn, deposes and
says that she is a Postal Inspector with the United States
Postal Inspection Service and charges as follows:

**<u>COUNT ONE</u>**
(Conspiracy to Commit Wire Fraud)

    1. From at least in or about March 2014, up to and
including in or about August 2020, in the Southern District of
New York and elsewhere, EVA CHRISTINE RODRIGUEZ, a/k/a
"Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a
"Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis,"
a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a
"Sergio Lawrence," a/k/a "Michael Lara," the defendants, and
others known and unknown, willfully and knowingly, did combine,

conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2.    It was a part and object of the conspiracy that EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Wire Fraud)

3.    From at least in or about March 2014, up to and including in or about August 2020, in the Southern District of New York and elsewhere, EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, the defendants operated a scheme to fraudulently induce victims to pay prohibited advance fees for mortgage assistance relief services by misrepresenting consumers' eligibility for mortgage modifications, exaggerating their companies' success rates, and offering false money back guarantees, and, in furtherance of the scheme, the defendants operated publicly accessible websites and caused multiple victims to send wire transfers to accounts that

the defendants controlled, including wire transfers through at
least one bank in New York, New York.

(Title 18, United States Code, Section 1343.)

The bases for my knowledge and the foregoing charges
are, in part, as follows:

4.    I am a Postal Inspector with the United States
Postal Inspection Service ("USPIS"), assigned to a financial
crimes squad.  I have received training and have participated in
investigations of financial crimes.  I have been involved
personally in the investigation of this matter.  I am familiar
with the facts and circumstances set forth below from my
personal participation in the investigation, including my
examination of reports and records, interviews I have conducted,
and conversations with other law enforcement officers and other
individuals.  Because this affidavit is being submitted for the
limited purpose of establishing probable cause, it does not
include all the facts that I have learned during the course of
my investigation.  Where the contents of documents and the
actions, statements and conversations of others are reported
herein, they are reported in substance and in part, unless noted
otherwise.

## BACKGROUND

5.    Based on my review of the United States Treasury
Department's website, I know that in or about early 2009, the
Treasury Department launched the Making Home Affordable ("MHA")
Program to help financially struggling homeowners avoid
foreclosure.  A main component of the MHA Program was the
voluntary Home Affordable Modification Program ("HAMP"), which
encouraged mortgage lenders and servicers to reduce distressed
homeowners' monthly mortgage payments to more affordable levels,
not to exceed 31 percent of a homeowner's gross monthly income.
HAMP set eligibility criteria for homeowners and guidelines for
participating lenders and servicers.  To qualify, a homeowner,
among other things, had to document financial hardship and
successfully complete a three-month trial modification.  During
the trial period, the homeowner had to make modified monthly
payments on a timely basis to prove that he or she could sustain
the new level of payment.  If the homeowner was able to do so,
he or she was offered the opportunity to permanently modify his
or her mortgage.  The permanently modified monthly payments
typically approximated, but were not necessarily the same as,

the trial payments.  The deadline for HAMP applications was December 30, 2016; thereafter, no new applications were accepted.  However, based on my review of mortgage modification agreements from a number of mortgage companies, I am aware that in addition to HAMP, mortgage companies also offered their own modification programs for which they set their own eligibility criteria.  These non-HAMP modification programs also typically required homeowners to complete trial modifications.

6.   In or about early 2009, the Federal Trade Commission ("FTC") promulgated the Mortgage Assistance Relief Services Rule (the "MARS Rule" or the "Rule") to protect struggling homeowners.  The Rule applies to all MARS providers, a broadly defined term that includes any service or program offered to the consumer, in exchange for consideration, that is represented to assist or attempt to assist the consumer with stopping, preventing, or postponing a foreclosure sale, or obtaining a mortgage modification, among other forms of relief. 12 C.F.R. § 1015.2.  MARS providers are required to disclose, clearly and prominently, in all consumer-specific commercial communications, the following consumer rights, among others:

a.   That the consumer "may stop doing business with [the MARS provider] at any time" and "may accept or reject the offer of mortgage assistance" that the MARS provider obtains from the consumer's lender or servicer.  If the consumer rejects the lender's or servicer's offer, the consumer would not have to pay the MARS provider, 12 C.F.R. § 1015.4(b)(1); and

b.   That even if the consumer accepted the MARS provider's services, the consumer's "lender may not agree to change [the consumer's] loan," 12 C.F.R. § 1015.4(b)(3).

7.   The Rule prohibited MARS providers from the following practices, among others:

a.   Misrepresenting, expressly or by implication, any material aspect of any MARS program, including the likelihood of negotiating or obtaining any represented service or result, such as mortgage modification or forbearance, 12 C.F.R. §§ 1015.2 and 1015.3(b)(1) and (2);

b.   Requesting or receiving payment of any fee or other consideration until the consumer has executed a written agreement between the consumer and the consumer's mortgage holder or servicer incorporating the offer of mortgage

assistance relief the MARS provider obtained from the consumer's mortgage holder or servicer, 12 C.F.R. § 1015.5(a); and

        c.   Not providing the following notice at the time that the MARS company provides the consumer with a written mortgage assistance agreement from the lender or servicer:

> This is an offer of mortgage assistance we obtained from your lender [or servicer]. You may accept or reject the offer. If you reject the offer, you do not have to pay us. If you accept the offer, you will have to pay us [previously disclosed amount] for our services.

12 C.F.R. § 1015.5(b).

        8.   The MARS Rule also made it "a violation of this rule for any person to obtain, or attempt to obtain, a waiver from any consumer of any protection provided by or any right of the consumer under this rule."  12 C.F.R. § 1015.8.

## THE RELEVANT ENTITIES AND THE DEFENDANTS

        9.   From reviewing publicly available business registration records, bank records, and the defendants' business records, and company websites, I am aware that at various times relevant to this Complaint, National Servicing Center ("NSC"), American Home Servicing Center ("AHSC"), National Advocacy Center ("NAC"), National Advocacy Group ("NAG"), and Capital Home Advocacy Center ("CHAC") (collectively, the "Companies"), and 1st Premier Asset Solutions ("1st Premier") were California-based MARS companies focusing primarily on mortgage modifications.  In particular:

        a.   NSC operated from at least in or about March 2014 to at least in or about June 2015.

        b.   AHSC operated from at least in or about May 2015 to at least in or about September 2016.

        c.   NAC operated from at least in or about July 2016 to at least in or about April 2017.

d.    NAG operated from in or about September 2016 to in or about March 2017.  NAG took over NAC's clients who existed as of in or about September 2016.

e.    CHAC operated from in or about September 2016 to on or about April 13, 2018.

f.    1st Premier has been operating since in or about May 2018 and is still in business.

g.    EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson" ("CHRISTINE RODRIGUEZ"), the defendant, is a citizen of the United States and a resident of California. CHRISTINE RODRIGUEZ was a manager of AHSC, NAC, NAG and CHAC, holding titles that included "Controller/Operations," "Operations Manager", "Operations and Compliance Manager," and "Chief Operating Officer."

h.    SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara" ("SERGIO RODRIGUEZ"), the defendant, is a citizen of the United States, a resident of California, and the son of CHRISTINE RODRIGUEZ.  SERGIO RODRIGUEZ was a compliance officer at AHSC and NAC, and the owner and/or president of NAG and CHAC.[1]

## THE FRAUDULENT SCHEME TO DEFRAUD DESPERATE HOMEOWNERS

### Overview

10.  As discussed in further detail below, between at least in or about March 2014 through in or about April 2018, EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, along with others, owned and/or managed the Companies through which they perpetrated a scheme to defraud and attempt to defraud financially distressed consumers who were facing or were at imminent risk of foreclosure through

---

[1] In this affidavit, I will refer to NSC, AHSC and NAC as the Rodriguez-Managed Companies, NAG and CHAC together as the "Rodriguez-Owned Companies," and all these companies collectively as the "Companies."

deceptive marketing practices.  Among other ways, the defendants recruited and attempted to recruit desperate homeowners as fee-paying customers by tricking them into believing that they had been pre-approved by their lender or servicer for a mortgage modification; falsely represented advance fees prohibited by the MARS Rule to be closing costs or other non-prohibited costs; fraudulently claimed that the Companies achieved success rates of 95 percent or higher for mortgage modifications; and made empty promises of a no-risk money back guarantee.  As a result of their intentional misrepresentations, and misrepresentations that they encouraged subordinates to make, the defendants induced thousands of consumers to pay an aggregate of more than $5 million in prohibited advance fees to the Companies, including a large number of consumers who were ultimately denied mortgage modifications or who received modification offers that were less favorable than they had been led to expect at the time they paid advance fees.

     11.  In or about February 2018, the Federal Trade Commission brought a civil action (the "FTC Action") against EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, and other individuals, as well as the Companies, except for NSC which no longer existed.  That civil action resulted in judicial injunctions against the defendants and the Companies (other than NSC).  Notwithstanding those injunctions, in or about May 2018, CHRISTINE RODRIGUEZ and SERGIO RODRIGUEZ started another MARS company, 1st Premier, which they have been operating using deceptive practices.

### The Defendants Falsely Claimed That Consumers Had Been Pre-Approved For Mortgage Relief Assistance

     12.  As discussed below, through intentionally misleading marketing materials, phone calls and emails, EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, tricked and attempted to trick and caused their subordinates to deceive consumers into believing that they had been pre-approved for a mortgage modification before they even signed up with and paid advance fees to the Companies.  In reality, the defendants knew that no

such approval had been given by the recipients' lender or servicer.

13.   From reviewing client files and other business records relating to the Companies, complaints that victims filed with the FTC and the Better Business Bureau ("BBB"), as well as my interviews with some of the victims, I learned as follows:

a.   EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, advertised the Companies' services to consumers nationwide through mailers sent through the United States Post Office and websites that one or more of them controlled.  The mailers typically conveyed a sense of urgency by referring to a mortgage default, an imminent foreclosure sale date, or a time-limited offer for a reduced monthly mortgage payment and interest rate. Some of the mailers advertised a specific new interest rate and monthly payment amount.  Further, all of the mailers contained an "Eligibility Code" and a toll-free number for the consumer to call.  When a consumer contacted the toll-free number that was on the mailer he or she received, or posted on one of the Companies' websites, a sales agent took down preliminary information, including, among other items, the Eligibility Code, the consumer's property address, the name of the consumer's lender or servicer, whether the consumer had received a modification within the last two years, whether the consumer had filed for bankruptcy, and the reason the consumer was experiencing financial distress.

b.   After the initial call, the sales agent typically sent the consumer follow-up documents.  One such document used by the Rodriguez-Managed Companies was titled "Eligibility Confirmation."  The Eligibility Confirmations were designed to mislead consumers into believing that their lender or servicer had already determined that they were eligible for reduced monthly mortgage payments, as long as they promptly submitted an application for a mortgage modification.  In particular, the Eligibility Confirmation informed the consumer, "You are confirmed for the following program(s)," which was HAMP or another mortgage modification program.  The Eligibility Confirmation noted the consumer's "Current Loan Payment" and provided a "New Estimated Payment PITI [principal, interest, taxes and insurance]."  To entice consumers to use the Companies' services, the new estimated monthly mortgage payment

was typically one hundred to several hundred dollars lower than
the consumer's then-existing monthly payment.  In a section
entitled "What you need to do," the Eligibility Confirmation
provided an "Estimated Trial Payment Period Plan," consisting of
three "estimated due dates" for payment of the New Estimated
Payment PITI.  According to the Eligibility Confirmation,
"[a]fter [the homeowner] make[s] all trial payments on time,
this loan restructure will be permanent."

      c.   The Eligibility Confirmations also advised
the homeowner to intentionally withhold mortgage payments:

> To move forward you will need to make the
> choice, and not make [two or three months
> of] mortgage payments to meet the "imminent
> default" requirement for this program.

      d.   In addition to the Eligibility Confirmation,
consumers who provided preliminary information to the Rodriguez-
Managed Companies also typically received a form entitled
"Proprietary form used for consumer results" (the "Proprietary
Form"), which again informed the homeowner that he or she was
"Eligible for: [name of loan modification program]."  Similar to
the Eligibility Confirmations, the Proprietary Forms contained a
chart that showed the "Old [monthly] payment," the "New Modified
[Monthly] Payment," and the "Total Savings" over one, five, ten
and fifteen years.  The New Modified Payment, which included
principal, interest, taxes and insurance, was typically one to
several hundred dollars lower than the homeowner's then-existing
payment.  The Proprietary Forms also specified the "New Interest
Rate," which was usually between 2% and 3%.  In addition, the
Proprietary Forms informed the homeowner that "FINALIZED CLOSING
COSTS WILL BE IN THE AMOUNT OF $[amount] FOR 1st MORTGAGE."

      14.   The Eligibility Confirmations and Proprietary
Forms were deceptive in at least two ways:

      a.   First, prior to sending out the Eligibility
Confirmations and Proprietary Forms, the Rodriguez-Managed
Companies had not actually verified with the homeowners' lender
or servicer that homeowners would qualify for any form of
mortgage assistance.  Those documents, which contained
representations regarding new reduced monthly payments and
interest rates, were sent to homeowners before mortgage
modification applications had been submitted on the homeowners'
behalf to their lender or servicer.  Based on my training and
experience, I know that lenders and servicers would not have

committed to loan modifications without receiving a complete modification application from a homeowner.  Moreover, from reviewing the HAMP guidelines, I also know that homeowners were required to document their financial hardship and income before they could be considered for HAMP modifications.  Therefore, I believe that the representations regarding new monthly payments and interest rates were false.

b.    Second, the Eligibility Confirmations advised homeowners, in substance and in part, that "[t]o move forward you will need to make the choice, and not make [two or three months of] mortgage payments to meet the 'imminent default' requirement for this program," i.e., the loan modification program for which the consumer was allegedly eligible.  However, under HAMP, there was no requirement that a consumer be at least two months behind in mortgage payments to qualify for a HAMP modification, so long as the consumer could demonstrate that he or she was at imminent risk of missing a mortgage payment.  Based on my participation in this investigation, I believe that one of the reasons homeowners were encouraged to skip mortgage payments was so that they would have the money to pay the advance fees charged by the Rodriguez-Managed Companies.

15.    Because the Eligibility Confirmations and Proprietary Forms were routinely used by the Rodriguez-Managed Companies, I believe that EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, as managers of those Companies, knew of and approved the use of such documents.

16.    The Rodriguez-Owned Companies – NAG and CHAC – largely discontinued the use of Eligibility Confirmations and Proprietary Forms.  However, in recorded calls[2] and emails, representatives of the Rodriguez-Owned Companies, including EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," the defendant, continued the practice of tricking homeowners into believing that their eligibility for mortgage modifications

---

[2] CHAC used a commercial communications service to handle and record customer calls.

had been confirmed with their lender before they would be
accepted as clients and charged advance fees.  For example:

     a.  From reviewing transcripts and information
provided by the FTC, I know that an FTC investigator who was
acting in an undercover capacity (the "UC") and posing as a
financially struggling homeowner had several recorded telephone
conversations with CHAC representatives.  In one of those
conversations, a CHAC sales agent ("CHAC Sales Agent-1") told
the UC, in substance and in part, that:

> [W]e have to evaluate your case, which is a
> completely free service when we evaluate and
> contact your lender because we have to
> define what the process is going to be,
> number one.  Number two is we're going to be
> able to obtain a positive outcome for you
> before we even take on your case.

During another call, CHRISTINE RODRIGUEZ told the UC, in
substance and in part, that personnel in CHAC's "discovery
assessment department" would:

> call your lender and make sure you meet the
> requirements.  Once the lender gives us an
> approval for entry into the loss mitigation
> department, then we are able to accept your
> case.  Because we don't want to accept your
> case until we know we are going to be able
> to give you that beneficial outcome that
> you're looking for.

     b.  Similar representations were also made to
actual consumers.  The following are excerpts from
communications with consumers, during which CHRISTINE RODRIGUEZ
identified herself as "Elizabeth Powers," a name which she
admitted using during the FTC Action:

     i.  In a recorded call on or about April 4,
2018, CHRISTINE RODRIGUEZ told a consumer, in substance and in
part:

> We already have an approval, OK.  We have an
> approval for entry [into a loan modification
> program].  Your lender has admitted us into
> your reentry to get you out of foreclosure,
> OK.  If we didn't have that, [name
> redacted], I'd be calling and telling you

11

> I'm sorry we cannot take your case. . . . We
> let your lender know we're going to be
> representing you, and if they're willing to
> accept our submission for modification.  We
> can't just arbitrarily send it in.

When the consumer asked if her lender had already agreed to
accept her loan modification application, CHRISTINE RODRIGUEZ
responded, "Yes, of course!"  In truth, CHAC representatives did
not contact lenders until customers paid advance fees.

> ii.  In an email to another consumer sent on or
about September 29, 2016, CHRISTINE RODRIGUEZ stated, in
substance and in part:

> Our discovery assessment department has
> reviewed your file and has issued an
> Approval to move forward with your case.  We
> do not accept any filed unless we know
> beforehand we are going to be able to render
> you a positive outcome.

17.  In actuality, as further explained below, many
consumers who paid the Companies advance fees for their services
were later denied mortgage modifications, demonstrating that the
representations to consumers that they had been pre-approved by
their lender or servicer for mortgage relief were false.
According to an affidavit of a former CHAC employee (the "Ex-
Employee"), some sales agents, with the encouragement of EVA
CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a
"Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis,"
a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson,"
and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a
"Michael Lara," the defendants, simply put consumers on hold,
waited a few minutes, then resumed the call and falsely claimed
that CHAC had contacted the consumer's lender and the consumer
had already been approved for a mortgage modification.

## The RODRIGUEZES Fraudulently Exaggerated
## The Companies' Success Rates

18.  As part of the scheme to defraud, EVA CHRISTINE
RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth
Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a
"Christina Elizabeth Davis," a/k/a "Christina Anderson," and
SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a
"Michael Lara," the defendants, fraudulently touted, and caused

their subordinates to falsely tout, approval rates of 95% or higher, which the RODRIGUEZES knew to be false.  SERGIO RODRIGUEZ sent emails to AHSC and NAC sales agents instructing them to send the same standardized email to consumers who were "ready to be on board with the Modification Program."  The standardized email included the assertion:  "We have 95% approval rate in helping people save their homes by reinstating their loan."  SERGIO RODRIGUEZ himself claimed, in recorded calls and emails, approval rates of between "95.99%" and "98.9%."[3]  CHRISTINE RODRIGUEZ made similar false claims on recorded calls with consumers, touting approval rates as high as 98 percent.

19.   In truth, the Companies' approval rates were nowhere near 95 percent.  Beginning in or about September 2016, the Rodriguez-Owned Companies used an online customer relationship management database (the "CRM Database") which tracked the work performed for clients and the status of client leads.  The CRM Database contained approximately 672 files for which the last workflow entry was between on or about September 20, 2016 (the earliest date in the Database) and on or about December 31, 2017.  Of those 672 files, only approximately 20 percent was marked as "P-File Closed: Approved."[4]  Approximately

---

[3] In those calls and emails, SERGIO RODRIGUEZ identified himself as "Sergio Lawrence," an alias that he admitted using to the FTC.

[4] The other workflow categories included "Closed-Non Compliant," "Closed-Other," "Closed-Non Payment," "P-Denied-to be resubmitted," "P-File Closed: Denied," "P-File W/Agent," "P-File with Management [sic]," "P-Hold for Non Payment," "P-Negotiation File," "P-Non Compliant," "P – Pending Approval Letters," "P-Pending Denial Letters," "P-Pending Document Preparation," "P-PKG Completed for Submission," "P-PKG Submitted/In Underwriting," "P-PKG Submitted/Missing Documents," "P-PKG Submitted/To Lender," "P-PKG Submitted/Under Review by Underwriter," "P-Refund Request," "P-Processor to follow up with lender," and "P-WELCOME INTRO CALL NEEDED," "Closed-Non-Compliant," "Closed-Other," "Closed-Non Payment," "ED-CLOSED," and "ED-New Eviction Defense File."  Based on my participation in this investigation, including my review of client files and certain former employees, I know that the preface "P" denoted clients who have submitted documentation and payment in anticipation of loan modifications, "S" stood for sales, and "ED" stood for eviction defense.

14 percent was classified as "Pending Approval Letters."  Many
of the files marked "Pending Approval Letters" had been pending
for half a year or longer, suggesting that they were never
actually approved.

20.   I have also reviewed a motion to dismiss the FTC
Action by EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez,"
a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina
Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina
Anderson," the defendant.  In her motion to dismiss, CHRISTINE
RODRIGUEZ admitted that CHAC's approval rate between October
2017 and April 2018 was not 95 percent or higher as victims had
been told, but rather "twenty-five percent, of the total client
list with another twenty-one percent pending approval."

21.   The CRM Database contained only a small number of
the clients of the Rodriguez-Managed Companies.  However, based
on CHAC's results, which operated similarly to the Rodriguez-
Managed Companies, I believe that the approval rates obtained by
the Rodriguez-Managed Companies were also far below 95 percent.
My belief is supported by an MHA Program report entitled "HAMP
Application Activity by Servicer As of December 2017," which
compiled statistics from over twenty banks and servicers,
including Bank of America, CitiMortgage, JPMorgan Chase Bank,
Nationstar Mortgage, Ditech Financial, and Ocwen Loan Servicing,
among others.  That report, which was based on voluntary
reporting by the participating lenders and servicers, showed
that for the period from on or about June 1, 2010, to on or
about December 31, 2017, these institutions received an
aggregate of approximately 9.5 million mortgage modification
requests, of which approximately 2.9 million were approved (or
about 30.5 percent) and 6,614,629 were denied (or approximately
69.5 percent).  Based on CHAC's results and national statistics,
I believe that claims that the Rodriguez-Managed Companies
achieved approval rates of 95 percent or higher were also false.

### The Defendants Fraudulently Claimed That They Were Not Charging Prohibited Advance Fees

22.   The Companies charged customers advance fees
expressly prohibited by the MARS Rule, yet lied to customers by
claiming that their fees were different.  The Companies' client
agreements contained provisions which directly contravened the
MARS Rule's ban on advance fees.  In particular, all of the
Companies included the following provision, among others, in
their client contracts:

> Client(s) will pay a fee of $[amount] to
> [Company] in exchange for its documentation
> preparation products.  This fee is due after
> the file has been reviewed by staff and, or,
> management for approval eligibility.  Upon
> receiving payment, the requested
> documentation and signed application,
> [Company] will begin the preparation of the
> file.

The advance fee was usually in the range of $2,000 to $6,000 per
client, divided into a maximum of three installment payments.

23.   As discussed in Paragraph 13 above, the
defendants fraudulently represented the Rodriguez-Managed
Companies' advance fees to be "closing costs," even though the
so-called "closing costs" had to be paid upfront and not
refunded even when a homeowner never "closed" on a modified
mortgage.   I believe the misleading reference to the advance
fees as "closing costs" was a deliberate attempt to circumvent
the MARS Rule's ban on advance fees.

24.   After EVA CHRISTINE RODRIGUEZ, a/k/a "Christina
Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth
Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a
"Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a
"Sergio Lawrence," a/k/a "Michael Lara," the defendants, formed
the Rodriguez-Owned Companies in or about September 2016, they
stopped referring to the advance fees as "closing costs."
Instead, based on recorded conversations and call scripts I have
reviewed, I know that the defendants told and instructed their
employees to tell consumers that the advance fees were for
"documentation preparation."  When consumers who were acquainted
with the MARS Rule questioned the legality of the upfront fees,
the defendants responded that the upfront fees were not for the
mortgage modification, but for their "process" and "expertise,"
thereby falsely implying that their advance fees were not
prohibited.  For example:

a.   In a recorded phone conversation on or about
April 4, 2018, CHRISTINE RODRIGUEZ told another consumer, in
substance and in part:

> We're not charging you for your
> modification.  That's free.  We're charging
> you for the 120 days [of work] that it's
> going to take us to get it for you.

15

b.    In another recorded phone conversation on or about March 22, 2018, CHRISTINE RODRIGUEZ told another homeowner, in substance and in part:

> [T]he money we're requiring from you is not for a loan modification.  That is for our process to get you the loan modification. So you're not paying for the loan modification, you're paying for the work that we're doing which is going to take anywhere from 90-120 days. . . . Our fees are not associated with the loan modification.  They're associated with the process that we do for you to get it.

c.    In another recorded call on or about April 4, 2018, SERGIO RODRIGUEZ told another consumer, in substance and in part, that "[m]odification is a free process.  What you're paying the company to do is for the processing, for the experience that they have."

25.    As discussed in Paragraph 13 above, the Companies sent bulk quantities of mailers to financially distressed homeowners.  The Rodriguez-Managed Companies' mailers failed to include any of the disclosures required by the MARS Rule described in Paragraphs 6 and 7(c) above.  Some of the CHAC mailers advised consumers, in fine print, that "[y]ou may stop doing business with us at any time, you may accept or reject any offer of mortgage assistance."  The CHAC mailers did not, however, contain the mandatory disclosure:  "If you reject the [lender's] offer, you do not have to pay us."  Based on my participation in this investigation and on the misrepresentations noted above, I believe these omissions were an intentional aspect of the scheme to trick consumers into paying the prohibited advance fees.

26.    As a result of these misrepresentations and omissions, victims who were already in severe financial difficulty were charged, in the aggregate, millions of dollars in prohibited advance fees, even when they were denied mortgage modifications, received mortgage modification offers that they declined, or started but later decided not to proceed with a loan modification application.

27.    Many victims paid the advance fees with wire transfers that were processed through a bank headquartered in

New York, New York ("Bank-1"), including the following, among others:

        a.   On or about August 2, 2016, a wire transfer in the amount of $2,000 from a customer ("Victim-1") to NAC was processed through Bank-1 in New York, New York.

        b.   On or about April 7, 2017, a wire transfer in the amount of $1,250 from another customer ("Victim-2") to CHAC was processed through Bank-1 in New York, New York.

## The Defendants Falsely Promised A Money Back Guarantee

        28.   To induce homeowners who were financially strapped into paying thousands of dollars in advance fees, EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, misled and attempted to mislead consumers into believing that the consumers would receive a refund if they were not approved for mortgage relief.  NSC, AHSC, NAC and NAG used virtually identical "Document Preparation Agreements." CHAC had a substantially similar "Professional Services Agreement."  All of those customer agreements stipulated:

                In the event the lender declines your
                document submission for a modification,
                forbearance, trial into modification or
                repayment plan, injunction with the document
                preparation [sic], you will receive a
                refund.

This provision was sometimes highlighted in the customer agreements sent to customers.

        29.   In addition to this written guarantee, EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," the defendant, also reiterated the false promise of refunds in recorded calls with consumers.  The following are excerpts from some of those recorded calls in which CHRISTINE RODRIGUEZ used the alias "Elizabeth Powers":

a.    On or about April 3, 2018, CHRISTINE RODRIGUEZ told a consumer, in substance and in part: "We guarantee our process, so . . . your money wouldn't be at risk."

b.    On or about April 4, 2018, CHRISTINE RODRIGUEZ told another consumer:

> [W]e are charging you for our process, and we are guaranteeing you this in writing by 100%.  If you don't get your modification, then you get your money back.  If we're negligent, if we drop the ball, or whatever, you will have a legal binding document that states that you get your money back.  How do we do this?  We call your lender before we accept your file. . . . We're not going to take your file unless we know that you're going to get the modification.

c.    On or about April 5, 2018, CHRISTINE RODRIGUEZ told a CHAC customer ("Victim-3") not to contact the client's lender directly, but rather to trust CHAC:

> We guarantee you this by not 50%, we guarantee our work 100%.  So you shouldn't be worried. . . . And you're going to be happy because otherwise we're going to have to give your money back if we made a mistake and we didn't get the work done.

30.    However, from interviewing certain customers and reviewing the data in the CRM Database as well as dozens of complaints filed with the Better Business Bureau, the Consumer Financial Protection Bureau, and other consumer protection organizations, I know that few customers who were denied a mortgage modification or another form of mortgage relief ever received a refund of their advance payments.  Many homeowners reported that the telephone numbers they had for the Companies became disconnected when they called to request refunds.  At least one homeowner ("Victim-4") informed me that he received a refund check from NSC, only to have the check rejected due to insufficient funds.

31.    As a further part of the scheme to defraud, the Companies' customer agreements also contained provisions that violated the MARS Rule's ban on advance fees and waivers to any consumer protection under the MARS Rule, and attempted to

undercut the Companies' money back guarantees.  For example, the Rodriguez-Managed Companies' Document Preparation Agreements stated that "the fee is considered earned by [name of Company] upon the completion of the prepared documentation" and "is not contingent upon any results for any process initiated by the Client(s) to their prospective lender(s)."  The CHAC Professional Services Agreement provided that the client was "responsible for full payment to Capital Home Advocacy Center if [the client's] lender accepts the prepared documents and the review process is initiated by [the client's] lender[.]"  In contravention of the MARS Rule, all of the customer agreements specified that "[i]f Client(s) decline(s) [the lender's] offer no refund is deserved or forth coming."

### The Rodriguezes Continued Fraudulent MARS Operations Even After They Were Judicially Restrained

32.  On April 12, 2018, as a result of their own investigation, the FTC moved in the United States District Court for the Central District of California for an ex parte temporary restraining order ("TRO") and asset freeze against AHSC, NAC, CHAC, EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants, among others, and the appointment of a temporary receiver based on alleged violations of the FTC Act, 15 U.S.C. § 45(a)(1), and the MARS Rule.  On April 13, 2018, United States District Judge Josephine L. Staton granted the TRO, froze the assets of AHSC, NAC and CHAC, and appointed a temporary receiver (the "Temporary Receiver") for those Companies.  On April 27, 2018, Judge Staton issued Preliminary Injunctions against AHSC, NAC, CHAC, the RODRIGUEZES, and others, enjoining them from misrepresenting or assisting others in misrepresenting any material fact in connection with mortgage modifications.  On August 23, 2019, Judge Staton granted the FTC's motion for summary judgment and imposed a permanent injunction barring the RODRIGUEZES from the marketing and sale of all debt relief products and services, and ordered monetary relief.  At the time, Judge Staton postponed issuing final judgment because another defendant had not yet been located and served.  On December 5, 2019, Judge Staton issued an Order for Permanent Injunction and Monetary Judgment against the RODRIGUEZES, AHSC, NAC and CHAC, and others that, among other things, permanently enjoined them the marketing and

sale of all debt relief products and services, and ordered monetary relief.

33.    Based on information and documents provided by the Office of the United States Trustee for the Districts of Louisiana and Mississippi, I learned that on or about May 2, 2018, or approximately two weeks after Judge Staton issued the TRO, a co-conspirator ("CC-1"), who was the then-twenty-four year-old granddaughter of EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," the defendant, registered 1st Premier Asset Solutions as a fictitious company name (i.e., CC-1, "doing business as" 1st Premier Asset Solutions ("1st Premier")) with the State of California.  CC-1 had previously worked for all of the Companies, except NSC.  I have visited 1st Premier's website and saw that it is also a MARS company.  In or about January 2019, another homeowner who was facing foreclosure ("Victim-5") signed an agreement with 1st Premier for "Document Preparation services" relating to an application for a mortgage modification, for which Victim-5 was charged a prohibited advance fee of over $16,000.  In a Schedule of Payments, the advance fee was presented as a "closing cost" and as "processing fees."  On or about February 12, 2019, Victim-5 received an email from a 1st Premier Processing Manager informing her (the 1st Premier Victim) that the auction sale date of her home had been cancelled.  Only subsequently did Victim-5 learned that on or about February 11, 2019, 1st Premier had filed a petition for a Chapter 7 bankruptcy in her (Victim-5's) name and forged her signature on the petition, without her knowledge or consent.

34.    I have interviewed two other homeowners ("Victim-6" and "Victim-7") who paid advance fees to 1st Premier.  The information they provided showed that 1st Premier is being operated, at least in part, by EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez," a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendants.  For example:

a.    Victim-6 told me, in substance and in part, that she learned of 1st Premier after receiving a mailer in or about June 2018.  Victim-6 initially dealt with "Christina Anderson," who sent Victim-6 an email attaching forms for Victim-6 to fill out, including a financial worksheet.  The signature block on the email identified "Anderson" as the

"Quality Control Manager."  According to "Anderson," the purpose of the forms was to enable 1st Premier to provide a "FREE evaluation of [Victim-6's] circumstances and let [Victim-6] know if [Victim-6 was a] good candidate for [1st Premier's] services." After Victim-6 completed and returned the forms, she received another email from "Anderson" who wrote, in substance and in part, that she ("Anderson") was "working on an approval" and "[i]f 1st Premier accepts your case a 100% guarantee will follow our process."  "Anderson" also wrote, "I am confident we will be able to assist you and bring you a positive outcome," despite the act that Victim-6 had informed "Anderson" that Victim-6 had previously been denied a modification.  Later that day, Victim-6 received an email from a "Michael Lara," a member of 1st Premier's "Compliance Team," that stated, in substance and in part, "CONGRATULATIONS!  And welcome to 1st Premier we have accepted your file to move forward[.]"  A male representative of 1st Premier also told Victim-6 that she ("Victim-6") should file for bankruptcy "as a place holder," but that if she did not pursue the bankruptcy it would just "fall off" and not hurt Victim-6.  Victim-6 paid an advance fee of approximately $2,500 to 1st Premier, but was denied any alternative to foreclosure by her lender.  Victim-6 then requested, but never received, a refund from 1st Premier.  Victim-6 identified the voice of "Elizabeth Powers," who is CHRISTINE RODRIGUEZ as discussed in Paragraph 16(b) above, from a recorded call as that of "Christina" at 1st Premier.

b.   Victim-7 informed me, in substance and in part, that she contacted 1st Premier regarding loss mitigation assistance in or about June 2019 and initially dealt with two 1st Premier representatives, a male named "Michael Lara" and a female named "Christine Anderson."  "Anderson" told Victim-7 that her home would be safe and her monthly mortgage payments would be lowered, and was promised a refund if she did not receive the modification.  However, 1st Premier would not process her documents until she paid processing fees in advance. Victim-7 paid 1st Premier a total of approximately $3,000 for document processing.  Subsequently, in or about September 2019, another 1st Premier representative told Victim-7 that her modification application had been denied and that she should stop paying money to 1st Premier because 1st Premier was just taking her money.  Victim-7 requested but was never given a refund.  Victim-7 also identified the voice of "Elizabeth Powers" as that of "Christine Anderson."

35.   I believe "Michael Lara" is SERGIO LORENZO
RODRIGUEZ, a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the
defendant, for several reasons.  First, SERGIO RODRIGUEZ has
used an alias at AHSC, NAC and CHAC, namely, "Sergio Lawrence."
Second, 1st Premier maintains account at Bank of America, on
which CC-1 is the signatory.  Account records showed no payments
to anyone named "Michael Lara" or any payments that appeared to
be wages to any other male, but did contain several $1,000
checks payable to "Sergio Rodriguez" as well as monthly checks
which contained an address in the memo line that matches SERGIO
RODRIGUEZ's registered address with the Department of Motor
Vehicles.  I believe that those checks were for his monthly
rent.  Third, I have reviewed an application by SERGIO RODRIGUEZ
for automobile insurance from a California insurance company.
In that application, SERGIO RODRIGUEZ indicated that he was
employed as "compl mgr" (i.e., compliance manager) at "1st
Premier," with an address that matches the address on 1st
Premier's website.  Fourth, from 1st Premier's bank records, I
know that it uses a CRM platform different from that used by
CHAC.  According to subscriber records from the new provider
(the "CRM Provider-2"), there are four authorized users for the
1st Premier account.  Of those four, "Michael Lara" is the only
male.  Given the fact that CHRISTINE RODRIGUEZ and SERGIO
RODRIGUEZ have worked together since at least AHSC, I believe it
is highly likely that SERGIO RODRIGUEZ is one of the authorized
users of the 1st Premier account with CRM Provider-2.

36.   I further believe that SERGIO LORENZO RODRIGUEZ,
a/k/a "Sergio Lawrence," a/k/a "Michael Lara," the defendant, is
involved in 1st Premier because the use of fraudulent bankruptcy
petitions was part of his modus operandus at CHAC.  For example,
in a recorded conversation on or about March 30, 2018, SERGIO
RODRIGUEZ instructed one consumer to file a Chapter 7 bankruptcy
petition and explained, in substance and in part:

> Just agree to whatever they're [i.e., the
> Court's staff] because basically what we're
> doing is you're just filing the petition.
> You're not going through the whole process.
> OK?  But again, that's in our world.  They
> [i.e., the Court staff] don't need to know
> that.

37.   From reviewing 1st Premier's bank records, I know
that it was paying for CRM services from a different provider
than the one used by CHAC as recently as February 2020, and that
payments continued to at least in or about mid-August 2020.  I

22

further know from visiting 1st Premier's website that it was
still publicly accessible as of on or about August 19, 2020.

      WHEREFORE, deponent prays that arrest warrants be
issued for EVA CHRISTINE RODRIGUEZ, a/k/a "Christina Rodriguez,"
a/k/a "Elizabeth Christina Powers," a/k/a "Elizabeth Christina
Davis," a/k/a "Christina Elizabeth Davis," a/k/a "Christina
Anderson," and SERGIO LORENZO RODRIGUEZ, a/k/a "Sergio
Lawrence," a/k/a "Michael Lara," the defendants, and that they
be imprisoned or bailed, as the case may be.


                                    _____
                                    BRANDY N. KING-GONZALEZ
                                    Postal Inspector
                                    U.S. Postal Inspection Service


Sworn to before me this
_24___th day of August 2020
by reliable electronic means (FaceTime)

_____
THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK